**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-1690**

———————

HOMI N. AMIRMOKRI,

                                    Plaintiff - Appellant,

        versus

SPENCER ABRAHAM, Secretary, Department of
Energy,

                                    Defendant - Appellee.

———————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Alexander Williams, Jr., District Judge.
(8:05-cv-01717-AW)

———————

Argued: December 4, 2007          Decided: February 22, 2008

———————

Before TRAXLER, Circuit Judge, HAMILTON, Senior Circuit Judge, and
John Preston BAILEY, United States District Judge for the Northern
District of West Virginia, sitting by designation.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Morris Eli Fischer, Bethesda, Maryland, for Appellant.
Tarra R. DeShields-Minnis, Assistant United States Attorney, OFFICE
OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.
**ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore,
Maryland, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Homi N. Amirmokri, an Iranian national, appeals the district court's order granting summary judgment in favor of the United States Department of Energy (the "DOE") on his employment discrimination and retaliation claims filed under Title VII of the Civil Rights Act of 1964. See 42 U.S.C.A. § 2000e to 2000e-17 (West 2003 & Supp. 2007). We affirm.

I.

Amirmokri was hired by the DOE in 1991, by Owen Lowe, the Associate Director in the Office of Nuclear Energy Science and Technology, a division of the DOE responsible for the management of nuclear facilities in the United States. At the time of the events in question, Amirmokri was a GS-15, Nuclear Engineer, and Lowe was his supervisor. Both men were based in the Washington, D.C. area.

Between 2001 and June of 2003, Amirmokri's assigned duties included serving as Program Manager for the Oak Ridge National Laboratory ("ORNL"), a nuclear energy facility in Oak Ridge, Tennessee. In this capacity, he visited ORNL every six to eight weeks, or as needed, and interacted with DOE employees as well as employees of DOE's contractor, UT-Battelle, who worked on site.

The events in question arose out of several complaints made by employees at ORNL about Amirmokri's unprofessional behavior during Amirmokri's May 2003 visit to ORNL. The first complaint originated

2

from Cathy Simmons, a UT-Battelle employee. As part of his duties, Amirmokri was responsible for reviewing transportation plans, including the Transportation Safety Document ("TSD") prepared by UT-Battelle for a Q-Ball cask that was to serve as a casing for nuclear material during transport within the ORNL facility. During the facility tour, Amirmokri raised concerns about the transportation plans to Raymond Bond, the facility manager at ORNL who was accompanying him. Bond advised Amirmokri that Simmons had drafted the TSD report and took Amirmokri to meet her. According to Bond, Amirmokri relayed his concerns about the TSD to Simmons and began to aggressively question Simmons about her work product. Simmons attempted to answer the questions, but did not do so to Amirmokri's satisfaction. The meeting "started to get out of control" with Amirmokri becoming frustrated with Simmons and cutting her off. J.A. 58. According to Bond, Simmons "was starting to visibly get shaken," prompting Bond to end the meeting. J.A. 59. Bond asked Amirmokri to prepare his questions and they would arrange another meeting to address them. Bond testified that Amirmokri's behavior was inappropriate, that he was "talking down" to Simmons, and that he handled himself in an unprofessional manner. J.A. 60. Simmons testified that she was "flabbergasted by [Amirmokri's] tone and [his] line of reasoning." J.A. 54. She also testified that Bond apologized to her later that day for bringing Amirmokri to her unannounced, as well as for Amirmokri's

"condescending attitude." J.A. 54. The incident was reported to Simmons's supervisor, Steve Marschman, and Simmons was asked to document the encounter.

The second complaint involved Gary Kelly, who served as a lead health physicist for the facility. During Amirmokri's tour of Kelly's area, Amirmokri was accompanied by Michael Woods, an ORNL facility representative. In order to gain access to a restricted area, Amirmokri (like all visitors) was required to provide Kelly with his name and position in order to obtain a dosimeter for possible radiation exposure. Kelly testified that he did not recognize Amirmokri and, when he asked him who he worked for, Amirmokri questioned Kelly as to why that mattered. When Kelly explained that he was required to record the information in order to report the dose to Amirmokri's employer, even if it was zero, Amirmokri told Kelly that it "did not matter [because the] dose would be reported to him." J.A. 385. Kelly reiterated that the dose had to be reported to Amirmokri's employer; if Amirmokri was self-employed, Kelly could record that, but Kelly could not issue the dosimeter without the required information. At some point, Woods interrupted the exchange by providing Kelly the requisite information for Amirmokri. Kelly issued the dosimeter, but called his supervisor and reported that he thought Amirmokri's conduct "was unprofessional" and that "if [i]t hadn't been for Mike Woods, [he] would not have issued the [dosimeter]." J.A. 387. Woods's

4

account of the dispute confirmed that Kelly required Amirmokri to fill out the requisite form for a dosimeter because Amirmokri, a program manager, was not on the ORNL list. Woods also confirmed that Kelly is required to record the names and employers of "people who come from off site to get dosimeters . . . so that they can send any dose records to that person." J.A. 116. Although Woods testified that he would not "characterize [Amirmokri's behavior] as rude," he appeared to acknowledge some dispute surrounding the incident. J.A. 117. According to Woods, "Kelly had asked [Amirmokri] what his name was as if he didn't know who he was. I think that kind of surprised [Amirmokri]. And then he asked him who did he work for, as if he didn't know who [Amirmokri] was, which he did because [Amirmokri's] been down . . . to see Gary Kelly several times in the past." J.A. 117. As noted above, Kelly stated that he did not recognize Amirmokri.

On May 8, 2003, Lowe received a telephone call from an Oak Ridge manager advising him of Simmons's and Kelly's complaints about Amirmokri's unprofessional behavior. Lowe, in turn, immediately contacted Amirmokri and cautioned him to "be on his best behavior" while at ORNL. J.A. 76.

Despite this warning, a third incident involving Amirmokri occurred approximately a week later when Amirmokri met with Larry Boyd, a GS-14 General Engineer with local oversight for the Oak Ridge facility, to discuss an e-mail Boyd had sent to Amirmokri two

5

months earlier. In the e-mail, Boyd acknowledged that the decision was ultimately Amirmokri's to make, but he presented Amirmokri with several technical points for why he thought the TSD for the Q-Ball cask was sufficient to ensure safety. In the course of doing so, Boyd related that he felt additional assessment would be "a waste of taxpayers' money." J.A. 65 (internal quotation marks omitted). Apparently, Amirmokri took great offense to Boyd's differing opinion as to the adequacy of the TSD. According to Boyd, Amirmokri "came into my office and shut the door[,] . . . sat down in a chair across from my desk and said, are you aware you can be sued for libel." J.A. 66. Boyd was taken aback by the comment, and he immediately contemplated (and asked Amirmokri) whether he needed to talk to a DOE lawyer before discussing the matter any further. Amirmokri referenced the libel threat at least two more times, but told Boyd that he (Amirmokri) had not yet contacted an attorney. According to Boyd, "the whole conversation was extremely disturbing . . . from a professional standpoint. It was not at all something that [he] was prepared to discuss. It took [him] totally by surprise." J.A. 67.

Disturbed by the encounter, Boyd reported the threat to his supervisor, who advised him to document the incident and, if he decided to pursue a more formal complaint, to do so quickly. Boyd also contacted a DOE lawyer, who reassured Boyd that they would represent him should anything materialize. Because Boyd felt that

Amirmokri was trying to intimidate him, Boyd decided to report the matter to Lowe but to "cut [Amirmokri] the slack and not pursue anything more formal than talking to Mr. Lowe about what had happened and letting him know that I really didn't appreciate it and that I would not put up with any such actions in the future." J.A. 179.

Because the incident with Boyd involved "the subject of qualifying the Q-ball, the same subject as with Cathy Simmons[,]" and occurred "a week after [he] had admonished [Amirmokri] to be on his best behavior," Lowe felt that further investigation was necessary. J.A. 76. Lowe additionally found the nature of the complaints "to be disturbing and, if true, very damaging to [Lowe's] ability to carry out [his] responsibilities for nuclear safety at [ORNL]." J.A. 76. Lowe decided that he should go to Oak Ridge and talk directly to the people who had raised the allegations and, after consultation with and approval from his superior, William Magwood, Lowe traveled to ORNL to personally investigate the complaints.

Upon his arrival at ORNL, Lowe interviewed Simmons, her supervisor Marschman, Bond, Bond's supervisor Carol Scott, and Kelly. Lowe then returned to headquarters and met with Amirmokri. However, Amirmokri "did not take the opportunity to rebut any of these issues that had been raised, other than saying that none of it had happened," which Lowe did not find to be credible. J.A. 78.

7

Lowe initially determined that Amirmokri should be reassigned away from his program manager duties at ORNL and to a "more headquarters-oriented" position. J.A. 79. Because Lowe had "no direct line authority over the people that operate[d] the [ORNL] reactor and the nuclear facilities at Oak Ridge," Lowe was dependent upon having "good, solid collegial working relationships with the people at the site." J.A. 92. As he later advised Amirmokri, Lowe felt that "[t]he combined effect of the[] incidents ha[d] discredited [his agency] and disqualified [Amirmokri] as a representative of the Office to both the [DOE] and UT-Battelle organizations at Oak Ridge." J.A. 38.

On June 16, 2003, Lowe advised Amirmokri in writing of his reassignment. Amirmokri was advised to concentrate on the Documented Safety Analysis ("DSA") Review for the High Flux Isotope Reactor ("HFIR") at Oak Ridge, which was already a part of his duties and expected to take a large amount of time, and notified of the specific reasons for the reassignment as follows:

> Based on my personal observations since last July, I have concluded that you are no longer an effective representative of NE to the Oak Ridge DOE and contractor organizations. I have similar concerns about your interactions with headquarters personnel. I have also concluded that some of your interactions with ORNL and [other] personnel during your recent trip to Oak Ridge were totally unacceptable and have sufficiently damaged NE's effectiveness at the site that I must make a change.
>
> You have stated several times since I became your supervisor in July 2002 that you have too heavy a workload. I am also making this assignment in response to your stated concern. This assignment will enable you

to achieve a timely and thorough completion of the DSA review.

J.A. 36. Amirmokri was also directed to participate in mandatory counseling through the Employee Assistance Program, and he was advised that disciplinary action as a result of the Oak Ridge incidents was under consideration.

DOE's human resources department reviewed Lowe's investigation and recommended a suspension of Amirmokri for two to five days, but Lowe disagreed. He felt that the matter could be handled with a simple letter of reprimand. Magwood testified that he too believed Amirmokri's conduct at ORNL warranted suspension, but he supported Lowe's decision (as the more immediate supervisor) to impose a lesser sanction. On June 27, 2003, Amirmokri received a written, but limited, reprimand for "inappropriate behavior while on official Government business at Oak Ridge between May 5, 2003 and May 16, 2003." J.A. 38. The reprimand referenced Amirmokri's "inappropriate and unprofessional behavior" on "three separate occasions," as reported to Lowe by the Oak Ridge personnel; specifically, Amirmokri's "rude and condescending" demeanor towards Simmons, his disregard of the requirements for access to a restricted radiation area, and his "line of questioning and aggressive behavior" towards Boyd on May 15, 2003, the latter of which "occurred after [Lowe] had admonished [Amirmokri] on May 8, 2003, via telephone, to avoid such conduct." J.A. 38. Amirmokri was again "admonished to avoid similar behavior in the future and

9

to conduct [himself] during future DOE business interactions in only the most disciplined, polite, and professional manner." J.A. 38. The reprimand itself was to remain in Amirmokri's personnel file for only one year, at which time it would be removed. Amirmokri's salary and grade level remained unchanged.

In the fall of 2004, Amirmokri initiated an EEOC complaint against the DOE, alleging that he had been discriminated against based upon his Iranian national origin and retaliated against for having pursued a prior national origin discrimination and retaliation action against the DOE.[1] Following discovery and an evidentiary hearing, an administrative law judge ruled that, even assuming that Amirmokri had established a prima facie case of national origin discrimination and retaliation, the DOE had "articulated legitimate reasons for its actions," which he found were "not a pretext for either national origin discrimination or retaliation." J.A. 29.[2] Amirmokri then filed this action,

_____

[1]In the prior proceedings, Amirmokri alleged that the DOE failed to promote and train him because of his national origin, and delayed his promotion in retaliation for his having filed the EEOC complaint. A jury rejected Amirmokri's claim, and we affirmed that judgment on appeal. See Amirmokri v. Abraham, 119 Fed. Appx. 520 (4th Cir. 2005) (per curiam). Amirmokri's second EEOC complaint -- which led to this lawsuit -- was initiated after the district court entered judgment against him on the former complaint and while the appeal from that decision was pending before us.

[2]The ALJ also noted, as we do, that "[t]he real theme that runs through the Report of Investigation is that [Amirmokri] believed that actions were taken against him because of his refusal to violate [a safety regulation]." J.A. 30. However, as aptly noted by the ALJ, even if true, "[t]his belief is not founded upon

10

alleging that the reprimand and reassignment (to which he added an allegation of unattainable deadlines, at first, and then the deprivation of meaningful work assignments in his new duties) were adverse employment actions motivated by such discrimination and retaliation.[3]

                                II.

    In order to prevail on a Title VII retaliation claim, a plaintiff is required to show:  (1) that he engaged in protected activity; (2) that adverse employment action was taken against him; and (3) that a causal connection existed between the first two elements.  See Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).  Assuming that a prima facie case is established, the burden then shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for

_____

national origin discrimination or retaliation."  J.A. 30.

    [3]Amirmokri's complaint of unreasonable deadlines appears to involve his assigned responsibility to complete review of the DSA for the reactor at Oak Ridge.  According to Lowe, the preparation of the DSA review was a "heavy" responsibility.  J.A.  81. Amirmokri claimed that he was not only the best person to do the job, but possibly the only person to complete this assignment, which involved leading a team of 20-25 subject matter experts.  It is undisputed that Amirmokri worked overtime to meet the deadline for the project, although Lowe testified that it was not excessive or unusual; it is also undisputed that Lowe extended the deadline six months after Amirmokri complained and that Amirmokri made no further requests for an extension of the deadline.  Lowe disputes that Amirmokri was thereafter deprived of meaningful work assignments.

its actions." Id. (internal quotation marks omitted). The burden then shifts back to plaintiff "to show that the reason is mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." Id. (internal quotation marks omitted).

In order to prevail on an employment discrimination claim based upon national origin, plaintiff must show: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) that the position remained open or was filled by a similarly qualified person outside the protected class. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). As in the retaliation context, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. If the employer satisfies this requirement, the burden returns to the plaintiff to demonstrate that the reason is a pretext for discrimination based upon his national origin. See id.

In the instant case, it is undisputed that Lowe, who hired Amirmokri and had absolutely no involvement with or in the previous EEOC action or ensuing lawsuit, received two unsolicited telephone calls from ORNL personnel complaining of unrelated incidents of inappropriate behavior on the part of Amirmokri towards DOE and UT-

12

Battelle employees working on site.  After opting to give Amirmokri a mild verbal admonishment to be on his best behavior after the first complaint, Lowe received another complaint that Amirmokri had threatened an employee with a libel suit because the employee had expressed disagreement with Amirmokri's technical opinion as to the TSD requirements for the Q-Ball cast transport.  Lowe traveled to ORNL to personally interview each of the offended parties and, at the conclusion of the investigation, gave Amirmokri an opportunity to respond, but was met with only a general denial, which Lowe found to be not credible.  Lowe also determined that the combined effects of the complaints had discredited their agency and compromised Amirmokri's ability to effectively work with the ORNL facility personnel and contractors in the future.

Even if we assume that the actions taken against Amirmokri in the wake of his visit to ORNL qualify as "adverse employment actions" and that Amirmokri has met the other requirements of the prima facie case for his respective claims, Amirmokri cannot prevail on either of his claims because he has failed to demonstrate that Lowe's decision to reprimand him and reassign him away from his duties as project manager for ORNL was a mere pretext for discrimination based on his national origin or retaliation for his having previously filed suit for such claims.

With regard to the discrimination claim, there is absolutely no evidence that any complaint or employment action was taken based

13

upon Amirmokri's national origin and nothing that would demonstrate that the reasons given for the employment actions taken in the wake of the unsolicited complaints were a pretext for such discrimination.

With regard to the retaliation claim, it is undisputed here that Lowe was only vaguely aware of the prior lawsuit at the time he investigated the ORNL complaints and was not involved with the previous litigation nor aware of any specific details of it. Even if he had been, there is no evidence that anyone at the DOE instigated the complaints from ORNL, the complaints largely originated from employees of UT-Battelle who were working at the site, and there is no evidence that Simmons, Bond, Kelly, or Boyd were ever aware of Amirmokri's prior litigation.

For the same reasons, we are unpersuaded that pretext may be shown from the fact that William Magwood's deposition testimony in the previous lawsuit was taken approximately two months before the ORNL complaints were received. Magwood was Lowe's supervisor at the time of the ORNL visit and approved Lowe's decision to visit ORNL to investigate the complaints made by the employees at that facility. However, there is no evidence that Magwood played any role in the complaints that were lodged against Amirmokri and he played no role in their investigation other than to authorize Lowe to look into the matter. At best, Magwood merely supported Lowe's decision to impose a limited written reprimand -- a lesser sanction

14

than that recommended by the human resources department and that he personally felt was warranted -- and to reassign Amirmokri to other duties due to his diminished effectiveness as a representative to the facility.

Equally unavailing are Amirmokri's assertions that summary judgment was premature because there are factual issues regarding whether he was unprofessional and because pretext may be proven by the fact that Lowe did not interview Woods during his investigation. With regard to the former, it is largely irrelevant whether Amirmokri was, in fact, unprofessional or whether Lowe should have believed his general denial over the specific complaints of the three ORNL employees. The ORNL personnel made these complaints, placing Lowe in the position of having to deal with them. The only relevant question is whether Lowe's decisions were motivated by the desire to discriminate or retaliate, and there is nothing in the record that would support an inference that Lowe disbelieved the accounts of the three ORNL employees, yet used them as pretext for such a hidden motivation. With regard to the latter, it is uncontroverted that Woods was not present during Amirmokri's encounters with Simmons or Boyd. While Woods was present during Amimokri's interaction with Kelly, Kelly initiated that complaint when he reported Amirmokri's behavior to his own supervisor. Kelly was personally interviewed by Lowe and confirmed in his testimony that he regarded Amirmokri's behavior to be

15

unprofessional and offensive. At best, a minor discrepancy exists as to whether Lowe attempted to interview Woods and why that interview did not take place, but Woods has never denied that there was an "incident" between Kelly and Amirmokri. He simply offered his view that Kelly knew or should have known Amirmokri and should not have imposed the normal requirements for entrance to a restricted access area. In short, Woods was not such a critical witness that Lowe's failure to interview him could support a finding of pretext.

Finally, we find no abuse of discretion in the district court's denial of Amirmokri's request to conduct further discovery under Rule 56(f), which provides the district court with discretionary authority, in appropriate cases, to deny a premature motion for summary judgment where the nonmoving party demonstrates that he has not had adequate time for discovery or needs additional time to complete it. See Fed. R. Civ. P. 56(f). As noted by the district court, Amirmokri's "claims were thoroughly investigated at the administrative level," and "the central participants" were all deposed. J.A. 413. In addition, the ALJ conducted an evidentiary hearing where the pertinent witnesses were questioned. Because Amirmokri failed to demonstrate that additional discovery would aid in rebutting the DOE's legitimate reason for reassigning Amirmokri away from his on-site duties at ORNL as project manager and imposing a minor reprimand for the conduct that necessitated that

16

reassignment, we find that the district court did not abuse its discretion in denying Amirmokri's request for discovery.

To conclude, there is no indication that the DOE acted with a discriminatory or retaliatory motivation and, on the contrary, the evidence indicates that a reasonable determination was made that the complaints about Amirmokri had irretrievably compromised Amirmokri's ability to be effective as a DOE representative at the ORNL. The DOE has set forth legitimate, nondiscriminatory reasons for the alleged adverse employment actions taken against Amirmokri, and Amirmokri has failed to produce evidence upon which a reasonable jury could find the proffered reasons were a pretext for discrimination or retaliation. Accordingly, the district court did not err in granting summary judgment dismissing his retaliation and discrimination claims.

AFFIRMED