**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1288

TONI C. WORKS,

Plaintiff - Appellant,

v.

CAROLYN W. COLVIN, Acting Commissioner, U.S. Social Security
Administration,

Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    Richard D. Bennett, District Judge.
(1:10-cv-01284-RDB)

Argued:  February 21, 2013              Decided:  April 24, 2013

Before TRAXLER, Chief Judge, and KEENAN and THACKER, Circuit
Judges.

Vacated and remanded by unpublished per curiam opinion.

**ARGUED:** Richard Talbot Seymour, LAW OFFICES OF RICHARD T.
SEYMOUR, PLLC, Washington, D.C., for Appellant.  Jason Daniel
Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore,
Maryland, for Appellee.  **ON BRIEF:** Gary M. Gilbert, Sarah E.
Diouf, Stephanie M. Herrera, Daniel A. Katz,  THE LAW OFFICES OF
GARY M. GILBERT & ASSOCIATES, P.C., Silver Spring, Maryland, for
Appellant.   Rod  J.  Rosenstein,  United  States  Attorney,
Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Toni C. Works filed this employment discrimination suit under the Rehabilitation Act, 29 U.S.C. §§ 701 et seq., against the Social Security Administration (the "SSA" or "Appellee"). She claims the SSA illegally terminated her from a probationary program for disabled individuals attempting to re-enter the workforce. This case was first heard by an administrative law judge ("ALJ"), who decided in the SSA's favor, and that decision was upheld by the Equal Employment Opportunity Commission ("EEOC").

Works then filed a separate suit in the district court. There, in her response to the SSA's Motion to Dismiss, or Alternatively, for Summary Judgment, Works requested discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, as she had not yet had the opportunity to conduct discovery at the district court level. The district court granted the SSA's motion -- deeming it a summary judgment motion -- without passing on Works's discovery request. Indeed, the court addressed the request for the first time in its subsequent denial of Works's Motion for Reconsideration.

We hold the district court's denial of Works's discovery request was an abuse of discretion. Works set forth in an affidavit specific, discoverable evidence that could enable her to defeat the SSA's motion, including testimony from

3

SSA employees and managers who did not testify at the administrative hearing and were never deposed.

Therefore, we vacate the district court's orders granting summary judgment to the SSA and denying Works's Motion for Reconsideration, and remand with instructions to grant Works's request for discovery.

I.

A.

Works is a disabled veteran of the United States Navy. She suffered a service-related accident in 1985, which resulted in a permanently disabling seizure disorder. She was honorably discharged from the Navy in 1989. From November 1989 to September 1991, she worked as a biomedical equipment technician. The next year, Works stopped working as a result of her seizure disorder. She applied for and received 100% disability compensation from the SSA, which found her to be totally disabled. After that, Works applied for and received 100% disability benefits from the Department of Veterans Affairs ("VA"), which likewise found that she was completely disabled. From 1992 to 2002, Works did not have gainful employment.

On August 26, 2002, Works began working at the SSA as a probationary employee, "which meant she could work for the SSA on a trial basis for one year without having to discontinue her disability benefits to demonstrate whether she could

4

successfully perform the job and be retained on a permanent basis." <u>Works v. Astrue</u>, Civ. Action No. 10-1284, 2011 WL 1197655, at *1 (D. Md. Mar. 29, 2011) (J.A. 2156);[1] <u>see also</u> 20 C.F.R. § 404.1592(a). Works worked as a "Management Assistant" in the Office of Management Operations ("OMO"). As a Management Assistant, she was required to, <u>inter alia</u>, conduct workflow studies; maintain, gather, and compile informational records such as organizational and workflow charts; make routine calculations, such as staff hours and workload figures; and develop, evaluate, and advise on methods and procedures for providing administrative support systems to organizations. Her supervisors at OMO were Marjorie Warner, Branch Manager, and William Johnson-Bey, Deputy Branch Manager. OMO project managers for whom she worked were Noma Carter and Jane Leidig.

The quality of Works's performance during her tenure with OMO is disputed. On March 19, 2003, Johnson-Bey met with Works to discuss her mid-year performance review. There is no written record; however, in a later memo given to Works, Warner recounted the results of that review. That memo, which was given to Works on June 23, 2003, stated that at the mid-year point in March, Works's performance was "basically satisfactory,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

5

although not exceptional." J.A. 1701 (the "June 2003 Memo"). The June 2003 Memo continued, "The only negative addressed at [the time of the March mid-year review] was your handling of a budget data entry project assigned to you by the Deputy Branch Manager, Bill Johnson-Bey, which you had difficulty understanding and needed an excessive amount of direction to complete." Id.

The June 2003 Memo also mentioned another project: developing a database to capture course registration data. The memo states, "[W]e asked that you prepare and schedule a briefing to demonstrate the database. Your co-worker, shortly thereafter, demonstrated the database, in passing, and you interjected a few items. . . . [F]eedback since, has indicated that your co-worker has done most of the work on this project." J.A. 1701.[2]

Also during the first half of her probationary period, Works experienced some health problems. From late December 2002

---

[2] In April 2003, Works's supervisors asked for a presentation on the progress of this project, which she was completing with co-worker George Frank. At the administrative hearing, Warner testified, "[I]t was obvious that this was George's work and not Toni's" and said that Frank told her Works "was more of a hindrance than helping." J.A. 1103. Frank, who also testified at the administrative hearing, agreed that Works was "taking credit for the majority of th[e] project from [him]." Id. at 1031. But he also testified that Works had "good work ethics," was "a diligent worker," "applied herself," and her work was "good quality." Id. at 1017, 1018, 1020.

to January 2003, Works's doctors at the VA began trying new medications for her seizure disorder.  In January, she suffered a seizure at home and as a result, could not work for nearly two weeks.  Works had not accrued enough sick leave to cover her absence from work, so she requested advanced sick leave from Warner, who approved the request. On February 13, 2003, she suffered another seizure -- this time at work -- and requested another week's worth of leave, which was approved.  Works missed other days in February, both related and unrelated to her disability.  Her leave was approved for all of these days. See J.A. 1683-85 (leave slips with approval signatures of Johnson-Bey and Warner).[3]

During the spring and summer of 2003, Works took additional leave for issues unrelated to her seizures, but all of this leave was also approved by either Warner or Johnson-Bey. See J.A. 1686-97 (leave slips, all approved by Johnson-Bey or Warner).  Works also suffered a seizure on July 15, after which she missed work from July 15-17, and this leave was approved by Warner.  See id. at 1694.

---

[3] One of these leave slips for February 24 and 25 was approved by Warner "pending documentation."  J.A. 1685.  The record shows that a medical excuse was provided for February 25, but it is unclear whether Warner retracted her contingent approval.

7

The June 2003 Memo also outlined performance deficiencies during a portion of the second half of Works's probationary period, from March to June 2003. It stated, "Since [the March mid-year] progress review, several other issues have come to light, which indicate a need for improvement and which may impact our decision to retain you beyond your probationary period." J.A. 1701. These issues were as follows:

- Works was resistant to join the typing pool for two hours a day, which would have extended the opportunity to work overtime on the weekends, because Works did not want to work overtime;

- Works wrongly notified Warner that she could be released from having her work reviewed because her mentor was pleased with her work;

- Works took too long completing a project assigned by Johnson-Bey. The June 2003 Memo stated, "Much direction is needed to get a completed assignment from you. [Y]ou don't seem to comprehend the instructions given."

Id. at 1701-02. The June 2003 Memo went on to discuss Works's character traits as follows:

Dependability - [I]n addition to your assignments not being completed timely, you are frequently absent, unaware of your leave balances, and you seem to have trouble comprehending the rules for requesting and using leave. . . . Your documentation is usually vague and doesn't usually justify total incapacitation for duty. In addition, you frequently make incorrect entries on the sign-in sheets and you continue to make these incorrect entries even after instruction is provided. . . . Your sign-in and out times frequently disagree and your leave slips often do not agree with the entries in the leave column on the sign-in sheets[.] You also sign out or annotate your

8

> leave on other employees' lines, or you sign out, out of order.
>
> Application of Time – [Y]ou are often out of the area. You have been seen in the halls and at other employees' desks for long periods of time and you appear to be having personal conversations rather than work-related conversations. You have often been observed on the phone for long periods of time, as well, having personal conversations. You have also been observed sleeping during meetings, most recently at the CMA Townhall meeting.

Id. at 1702. The June 2003 Memo concluded with the statement, "Thus far your performance and conduct has considerably deteriorated since the last performance discussion and immediate and substantial improvement is needed." Id.

On July 18, 2003, after a three-day absence due to a seizure, Works went to Warner and asked if she would be retained beyond her probationary period. Warner told her, if she had to make the decision that day, Works would not be retained "because she hadn't made any effort to improve in any of the areas [] pointed out [in the June 2003 Memo]." J.A. 1121. After that conversation, Works approached the EEOC on July 22, 2003, about a possible claim. Then, she asked to meet with Warner and Johnson-Bey in order to show them that she was capable of performing the job. They agreed.

Warner set up the meeting for the morning of July 25. Works attended with a banker's box full of documents in order to justify the work she had been doing; however, upon closer

examination, the box was full of the same two pages copied over and over again.  When questioned about this, Works "began crying and talking about personal problems she was having with her home life."  J.A. 1122.

That afternoon, Works was given a notice of proposed removal, with an effective date of two weeks later, August 8, 2003, about two weeks short of the end of her one-year probationary period.  The termination notice gave the following reasons for termination:

- "repeated failure to complete assignments as expected," which can "largely be attributed to your excessive amount of time that you have been seen away from your workstation, socializing with others, aimlessly walking the halls and spending an inordinate amount of time on the telephone for personal reasons"; and

- "[I]t is essential that our employees report to work regularly and perform their duties.  Your actions are unacceptable because when you have been out on unscheduled leave, management cannot depend on you being available to accept and perform the assignments expected."

J.A. 2003.

The following Monday, July 28, 2003, Works returned to work and asked Warner for reassignment to a different position. Warner referred Works to Joan Stewart-Stevens, Assistant Associate Commissioner for Management Operations Support, who called a meeting with "all the managers . . . and team leaders," including Warner; Johnson-Bey; Leidig; Kathy Fox, Center

10

Director; Denise Kendall, Deputy Center Director; Yvonne Curry, Team Leader; and Phyllis Branch-McCoy.[4]   J.A. 1404-05 (the "Stewart-Stevens Meeting").   Stewart-Stevens asked all those present, "[S]hould this employee be terminated[?]" and "each one of them said yes."   Id. at 1405.   It is undisputed that Noma Carter, one of Works's project managers, was not present at the meeting.   Works alleges Carter was deliberately excluded; however, Warner testified at the administrative hearing that Carter simply "didn't show up," and that they obtained Carter's approval for termination the following day.   Id. at 1137.[5]

---

[4]   Branch-McCoy's position is not clear from the administrative record.

[5]   Carter testified at the administrative hearing that she was not invited to the Stewart-Stevens Meeting, but that her opinion would be that Works should not have been fired.   See J.A. 1481.   She also stated at the hearing that after Works was notified of her termination, she was "never" asked about Works's performance.   Id. at 1470.   This is contrary to Warner's testimony: "Bill Johnson-Bey and I met with [Carter] separately the next day [after Works was terminated] and asked her what her opinion was of Toni's performance . . . and we asked her if she was in agreement with [the termination]."   Id. at 1137.   Warner stated that Carter responded, "[Works] would function probably better in a job that was more structured and had more supervision" and that Works should not be retained.   Id. at 1137-38.

11

After Works's contact with the EEOC on July 22, 2003, the administrative investigation began. Works requested a hearing before an ALJ, and the administrative hearing took place during four days in August 2006. The ALJ ruled in favor of the SSA, finding the SSA granted the only accommodation Works ever sought (taking leave), Works had consistent performance problems, and those problems, rather than discrimination or retaliation, resulted in her termination. Works appealed to the EEOC, and on February 19, 2010, the EEOC affirmed the ALJ's decision.

Works then filed the instant action in the District of Maryland on May 21, 2010. On August 26, 2010, the SSA filed a Motion to Dismiss, or Alternatively, for Summary Judgment. Because this motion was styled as a motion to dismiss, by operation of the District of Maryland's Local Rules, a scheduling order could not be entered -- and discovery could not commence -- until the motion was resolved. See D. Md. Local Rule 104(4) ("Unless otherwise ordered by the Court or agreed upon by the parties, the conference of counsel required by Fed. R. Civ. P. 26(f) need not take place and discovery shall not commence and disclosures need not be made until a scheduling

12

order is entered.").[6] Works responded to the motion on February 8, 2011, and requested time to conduct discovery pursuant to Rule 56(f) (actually 56(d)).[7] Her attorney attached an affidavit specifically explaining the discovery needed at the district court level and the relevance thereof. See J.A. 1872-73 (the "Affidavit").

The district court granted the SSA's motion on March 29, 2011, without mentioning Works's discovery request. Works then filed a Motion for Reconsideration on April 12, 2011. In that motion, she noted that the district court "remained silent" on her discovery request, and she argued, "[t]he Court should have permitted [her] to conduct discovery before ruling for Defendant based on an incomplete factual record." J.A. 2173. The district court denied the Motion for Reconsideration on February 3, 2012. As to the discovery request, the district court stated only the following:

---

[6] The operation of this rule can be seen in Young v. United States, which states, "Because of the dispositive nature of the [motion to dismiss or for summary judgment], it is not appropriate at this time to enter a scheduling order that would permit discovery to commence." No. RDB-08-3349, 2009 WL 2170068, at *1 n.1 (D. Md. Jul. 20, 2009).

[7] Rule 56(f) was recodified as Rule 56(d) on December 1, 2010, without significant substantive change. In her response to the SSA's motion in February 2011, Works inadvertently cited to Rule 56(f). For ease of reference, we herein refer to the appropriate rule as "Rule 56(d)," regardless of which version was in effect at the particular time.

> [T]his Court does not need to expressly explain its reasoning when granting an order that is inconsistent with the requested relief. As the Fourth Circuit explained in Malbon v. Pa. Millers Mut. Ins. Co., "the determination of a motion need not always be expressed but may be implied by the entry of an order inconsistent with the granting of the relief sought." 663 F.2d 936, 939 n.8 (4th Cir. 1980).

Id. at 2274. Works then timely noted this appeal.[8]

## II.

Rule 56(d) "require[s] that 'summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986)); see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (Generally, "summary judgment is appropriate only after adequate time for discovery." (internal quotation marks omitted)). The rule "is intended as a safeguard against a premature grant of summary judgment . . . thus, [courts] should construe the rule liberally[.]" King v. Cooke, 26 F.3d 720, 726 (7th Cir. 1994); see also Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 245 n.18 (4th Cir. 2002) (discussing with approval sources in favor of applying the rule liberally). Such

---

[8] The district court also dismissed a number of Works's claims for failure to exhaust administrative remedies. Works does not appeal the judgment as to those claims.

14

requests should be denied, however, "if the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (internal quotation marks omitted). We should not reverse a denial of a Rule 56(d) request unless we find "a clear abuse of discretion or, unless there is a real possibility the party was prejudiced by the denial of the extension." Id. (internal quotation marks omitted).

III.

A.

In her response to the SSA's Motion to Dismiss or, Alternatively, for Summary Judgment, Works asked the district court for a chance to conduct discovery, as she had not yet had the opportunity to conduct discovery at all in the district court. She explained that she needed documents and deposition testimony on "a range of disputed issues," including:

- "Defendant's characterization of Plaintiff's work on certain projects";

- "Defendant's knowledge that Ms. Works' medical condition affected her work performance such that she required a reasonable accommodation";

- "Defendant's argument that Ms. Works was not a qualified individual with a disability because she could not perform the essential functions of the job of a Probationary Management Assistant"; and

15

- "The specific performance deficiencies Defendant asserts justify its termination of Ms. Works."

J.A. 1835. The Affidavit, which was attached to the response, explained that the following evidence needed to be collected:

- "instructions provided to Ms. Works";

- "correspondence or the details of conversations regarding Ms. Works' performance on those projects";

- "the final version of any projects assigned to Ms. Works, as well as drafts of Mr. Works' work on those projects";

- "medical documentation from the Nurse's Suite . . . as it may give some indication of how Ms. Works' seizure disorder affected her work performance and what symptoms she experienced and exhibited in the workplace";

- deposition testimony of Dionne (Harrison) Miller, Blas Rueda-Caraballo, Renee M. Moore, John Wargo, and/or Shawnte Jordan, "all of whom were Probationary Management Assistants either during Ms. Works' tenure at the Agency or shortly after her termination. In addition to being comparators, these employees possess critical information regarding the essential functions of the Management Assistant position";

- deposition testimony of Warner, Johnson-Bey, Yvonne Curry, and Noma Carter, "all of whom supervised Ms. Works on the various projects at issue and can provide insight into her work performance";

- deposition testimony of Denise Kendall, Janet Edrington, Kathy Fox, Ethel Maker, "and/or any other Agency Employee Relations staff who were involved in drafting or have knowledge regarding the Termination of Career Conditional Appointment issued to Ms. Works on July 25, 2003."

16

Id. at 1872–73.[9]

The SSA contends, "because the record in this case makes clear that [Works] had every opportunity to discover all pertinent facts necessary to her opposition," and because she "failed to demonstrate how any more discovery was 'essential' to her opposition," the district court's tacit denial of her request for discovery should be affirmed. Appellee's Br. 27. In support of its position, the SSA references the numerous exhibits and pages of testimony from the ALJ hearing available to Works and notes that she had ample time at the administrative level to collect evidence relevant to her case.

B.

Rule 56(d) provides,

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or

---

[9] We reject the SSA's contention that Works waived this request for discovery because it was "not included in the argument section of her summary judgment opposition brief" but rather, "tucked . . . in the middle of her recitation of the legal standards." Appellee's Br. 26. Works squarely presented a Rule 56(d) affidavit to the district court, which this court has deemed sufficient. See Harrods, 302 F.3d at 244 ("If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56([d]) affidavit[.]").

17

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). This court has long held that parties wishing to obtain additional discovery must "specifically allege why the information sought would have been sufficient to create a genuine issue of material fact such that it would have defeated summary judgment." Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir. 1995); see also Nguyen v. CAN Corp., 44 F.3d 234, 242 (4th Cir. 1995) (affirming district court's denial of Rule 56(d) request because Nguyen did not "focus our attention on an affidavit presented to the district court that particularly specifies legitimate needs for further discovery").

In Ingle v. Yelton, this court held that the district court abused its discretion in denying Ingle's Rule 56(d) motion in the context of a motion to dismiss, or in the alternative for summary judgment. See 439 F.3d 191, 194 (4th Cir. 2006). Ingle asked for extra time in order to seek videotape evidence of a police chase and shooting that left her son dead. This evidence was to be used to support Ingle's theory of the case with regard to qualified immunity: that the window in her son's car was closed when officers took shots at him. The defendant's theory, in contrast, was that Ingle's son was aiming his shotgun at the officers through an open car window. See id. at 195.

We held the district court abused its discretion in failing to grant this request for discovery because it

18

"seemingly ignored" an earlier request for such evidence, the necessary information was "possessed only by her opponent," and "there was a sufficient basis to believe such videos existed, and [] this evidence represented Ingle's principal opportunity to contradict the assertion that the district court found dispositive[.]" Id. at 196-97.

Like Ingle, here, Works set forth in the Affidavit legitimate requests for discovery that could very well "contradict the assertion[s]" made by the SSA to the district court, as explained infra. Furthermore, because certain key players in this matter -- employees of the SSA -- did not testify at the administrative hearing and were not deposed at that level or at the district court level, there is a "real possibility that [Works] was prejudiced by the denial" of her discovery request. Ingle, 439 F.3d at 195 (internal quotation marks omitted).

C.

Works brought three claims under the Rehabilitation Act, 29 U.S.C. §§ 701, et seq.[10] First, she claimed that the SSA

---

[10] Section 504 of the Rehabilitation Act provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

discriminated against her based upon her disability (the "Discrimination Claim"); second, she claimed that the SSA failed to accommodate her disability (the "Accommodation Claim"); and third, she claimed that the SSA retaliated against her for requesting leave and reassignment (the "Retaliation Claim"). As explained below, her specific requests for discovery bear on the disputed nature of each of these claims.

1.

The Discrimination Claim

The analysis used to determine whether an employer has discriminated under the Rehabilitation Act is the same as the analysis under the Americans with Disabilities Act ("ADA"). See Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001). To establish a claim of discrimination under the ADA, a plaintiff must show she (1) was a qualified individual with a disability; (2) was discharged; (3) was fulfilling her employer's legitimate expectations at the time of discharge; and (4) "the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (internal quotation marks omitted). The SSA claims discovery on this claim would be futile. We disagree.

The parties have agreed that Works has a disability: the seizure disorder. As to the other aspect of the first

20

element, in determining whether a plaintiff is a qualified individual, a court should ask whether she is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). A court must decide (1) whether she could perform "functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [her] to perform those functions." Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994) (internal quotation marks omitted) (alteration in original).

The Affidavit asks for deposition testimony of other Probationary Management Assistants who were employed either during Ms. Works's tenure at the SSA or shortly after her termination. We agree with the Affidavit that "these employees possess critical information regarding the essential functions of the Management Assistant position," J.A. 1873, which bears on whether Works was a qualified individual.

Furthermore, there is certainly some dispute as to Works's performance, the employer's expectations, and the level of instruction and training provided to Works. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (considering whether employee was performing to employer's "legitimate expectations" is key to establishing a prima facie discrimination claim). Indeed, one of Works's arguments to the district court was

21

"[w]hen she tried her best to complete projects successfully, she was often prevented from doing so because she was never given clear instructions or specific guidance as to what was expected of her."  J.A. 1817.  Noma Carter also testified, "I don't think" Works "received adequate training."  Id. at 1458.

To further investigate this claim, Works's attorney explains that he would like to ascertain the instructions provided to Works for each of the projects the SSA claims she failed to complete; correspondence or the details of conversations regarding Works's performance on those projects; and the final version of any projects assigned to Works, as well as drafts of her work on those projects.  We find these requests to be essential to Works's claim.

Likewise, as to whether the circumstances of Works's discharge raise a reasonable inference of unlawful discrimination, the record needs more development through relevant discovery, as stressed in Works's 56(d) request and the Affidavit.  Notably, Johnson-Bey -- one of Works's supervisors who approved her leave time, assigned projects to her, oversaw those projects, and ultimately participated in the decision to uphold her termination -- was never deposed and did not testify

at the administrative hearing.[11]  His testimony is crucial on the issue of Works's job performance and her termination.  Also relevant to this inquiry is the testimony of SSA managers Kathy Fox and Denise Kendall, who were allegedly present at the Stewart-Stevens Meeting.  These individuals also did not testify at the administrative hearing and were not deposed.

On this point, the SSA argues "the only perspective that is legally relevant is that of the Plaintiff's supervisors, Warner and Johnson-Bey," and the court should not sit as a "'super-personnel department'" that second-guesses management decisions.  Appellee's Br. 22-23 (citing King, 328 F.3d at 149; quoting Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005)).  The SSA also cites King for the proposition that "the alleged opinions of [plaintiff's] coworkers as to the quality of [plaintiff's] work are close to irrelevant."  329 F.3d at 149 (internal quotation marks omitted).

---

[11] The parties submit that because Johnson-Bey had retired from the SSA at the time of the administrative hearing, he was not subject to EEOC's subpoena power.  Thus, the only opportunity Works had to cross-examine Johnson-Bey was at her unemployment insurance appeal hearing, during which she was not represented by an attorney.  There, the focus was on Works's unemployment benefits and, specifically, whether Works had engaged in misconduct disqualifying her from receipt of unemployment benefits.  And, the cross-examination was necessarily limited by the scope of direct examination.

23

These admonishments do not apply given that here, the SSA has admitted, "Warner solicited feedback from coworkers who worked with [Works] and she was informed that [Works's] work performance was not acceptable and that [Works] had trouble completing virtually every assignment . . . given her." J.A. 32 (internal quotation marks omitted). Therefore, Warner's perception was undoubtedly based on the opinions and perceptions of Works's coworkers, which would make deposing those coworkers all the more crucial. Furthermore, because the SSA has acknowledged that Johnson-Bey's perspective is "legally relevant," Works should be able to depose him. Appellee's Br. 22.

2.

The Accommodation Claim

In order to prevail on a reasonable accommodation claim under the Rehabilitation Act, Works would have to prove (1) she was an individual with a disability in the name of the ADA; (2) the SSA had notice of her disability; (3) with reasonable accommodation, Works could perform the essential functions of the position; and (4) the SSA refused to make such accommodation. See Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001). See also 34 C.F.R. § 104.12(a); 45 C.F.R. § 84.12(a) ("A recipient [of federal financial assistance] shall make reasonable accommodation to the known physical . . .

24

limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program[.]") (internal quotation marks and alterations omitted)).

On this claim, the only accommodation Works sought was medical leave to deal with her recurring seizures. As stated above, there is evidence yet to be discovered regarding whether Works could perform the essential functions of the position, even considering her approved leave. This issue should be fleshed out with testimony from those individuals whom Stewart-Stevens said participated in the Stewart-Stevens Meeting and who were not deposed at the administrative or district court level – i.e., Warner, Johnson-Bey, Leidig, Kendall, Curry, Fox, and Branch-McCoy. Indeed, the Affidavit requests evidence from "any . . . agency Employee Relations staff who were involved in drafting or have knowledge regarding the Termination of Career Conditional Appointment issued to Ms. Works on July 25, 2003." J.A. 1873. Works's project managers could also speak to their perceptions of her performance at the time she was taking large amounts of leave related to her disability. Medical documentation from the Nurse's Suite –- also requested in the Affidavit –- could likewise shed light on if and how Works's seizure disorder affected her work performance.

25

3.

## The Retaliation Claim

In order to prevail on a Rehabilitation Act retaliation claim, Works must prove (1) she engaged in a protected activity; (2) the SSA took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. Hooven-Lewis, 249 F.3d at 272-74. If the SSA proffers a legitimate, non-retaliatory reason for the decision, then Works must rebut the reason as pretextual. See Brockman v. Snow, 217 F. App'x 201, 207, 208 n.6 (4th Cir. 2007) (Rehabilitation Act); Yashenko v. Harrah's N.C. Casino Co., 446 F.3d 541, 551 (4th Cir. 2006) (Title VII) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973)).

Again, discovery could aid Works on this claim. What is most pertinent to this analysis is the termination notice given to Works on July 25, 2003. That notice provided only two reasons for termination: (1) failure to complete assignments as expected, which was "largely . . . attributed to your excessive amount of time that you have been seen away from your workstation, socializing with others, aimlessly walking the halls and spending an inordinate amount of time on the telephone

26

for personal reasons"; and (2) being absent from work on unscheduled leave.[12]  J.A. 2003.

Further discovery could help Works to develop her theory of pretext.  To demonstrate pretext, a plaintiff must provide the court with admissible evidence that a defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination."  Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (internal quotation marks omitted); see also EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (internal quotation marks omitted)). First, Warner explicitly stated, "[t]he sole determination to fire [Works] was based on performance," J.A. 1303, despite the different reasons set forth in the termination notice, such as socializing and talking on the phone.[13]  Other potential

---

[12]  At oral argument, the SSA's counsel stated that the banker's box incident itself could be grounds for dismissal. However, management did not mention this incident in its termination notice.

[13] Even if these were reasons for her termination, there is disputed evidence regarding the time Works spent socializing and on personal phone calls, something that could also be developed with further discovery.  For example, Warner testified at the administrative hearing, "[Trevette] [H]ord, Yvonne Curry, Phyllis Branch, No[ma] Carter, [and] Bill Johnson-Bey . . . all told me that [Works] was on the phone and having a personal conversation."  J.A. 1116.  However, one of these individuals (Continued)

27

evidence could support the pretext argument, including information about Noma Carter's exclusion from the Stewart-Stevens Meeting and the idea that the SSA terminated Works for taking leave, while nonetheless admitting, "all of [Works's] leave requests were granted by the [SSA]." Appellee's Br. 32 n.3.

D.

Finally, we reject SSA's argument that because Works had a chance to conduct discovery at the administrative level, she is somehow barred from doing so in federal court. Amirmokri v. Abraham, 266 F. App'x 274 (4th Cir. 2008), the case cited by the SSA, is inapposite. In that case, "the central participants were all deposed." Id. at 282 (internal quotation marks omitted). Here, as mentioned supra, many of the crucial decision-makers were not deposed. Moreover, the Supreme Court has recognized a federal employee's right to a trial anew following an adverse administrative decision. See Chandler v. Roudebush, 425 U.S. 840, 848 (1976) (holding, in the Title VII context, "Congress intended to accord federal employees the same

---

has declared, "[Works] did not engage in extended conversations on the telephone. All employees are allowed to make and receive telephone calls, and Ms. Works never abused the privilege bestowed upon us." Id. at 1976 (Hord affidavit). Furthermore, Carter claimed Works "did not socialize at the workplace any more than other employees." Id. at 1978 (Carter affidavit).

28

right to a trial de novo [following administrative proceedings] as is enjoyed by private-sector employees[.]");[14] Massingill v. Nicholson, 496 F.3d 382, 384 (5th Cir. 2007) ("Once a federal-sector employee exhausts her administrative remedies, she can file two types of civil actions: a suit to enforce the final administrative disposition, in which the court examines only whether the agency has complied with the disposition, or de novo review of the disposition." (emphasis added) (footnote omitted)). See also Boandl v. Geithner, 752 F. Supp. 2d 540, 557 (E.D. Pa. 2010) ("While we are entitled to review the administrative record, we are also entitled to consider new evidence presented by the parties, and are not bound in any way by the determinations made by the [administrative review boards] below." (alteration in original)).[15]

Further, while we are cognizant that parties who are "dilatory in pursuing discovery" should not find solace in Rule 56(d), Harrods, 302 F.3d at 246, we have been presented with no

_____

[14] Although Chandler addressed Title VII, the Rehabilitation Act and the ADA share "standards used to determine whether" a violation has occurred, 29 U.S.C. § 794(d), and the ADA, in turn, follows the "powers, remedies and procedures" set forth in Title VII, 42 U.S.C. § 12117(a). See also Spencer v. Ashcroft, 147 F. App'x 373, 375 (4th Cir. 2005).

[15] This court has also held in an unpublished opinion, "[T]he existence of an administrative investigation and record" does not "automatically preclude[] the need for discovery." Radi v. Sebelius, 434 F. App'x 177, 179 (4th Cir. 2011).

evidence tending to show that Works was dilatory in this manner, and the district court certainly made no such finding in its implicit denial of Works's request for discovery.

## IV.

For the foregoing reasons, the district court's orders granting summary judgment to the SSA and denying Works's motion for reconsideration are vacated, and this matter is remanded for the district court to grant Works's request for discovery.

<u>VACATED AND REMANDED</u>